# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

*In re* POPIOLEK/JONES, Minors.

UNPUBLISHED
September 8, 2015

No. 326422
Delta Circuit Court
Family Division
LC No. 14-000819-NA

*In re* K. JONES, Minor.

No. 326492
Delta Circuit Court
Family Division
LC No. 14-000820-NA

Before: BOONSTRA, P.J., and MURPHY and MARKEY, JJ.

PER CURIAM.

In this consolidated appeal,[1] both respondents appeal by right from orders of the trial court terminating their parental rights to their minor children. In Docket No. 326422, respondent-mother appeals the order of the trial court terminating her parental rights to both children, JP and KJ, under MCL 712A.19b(3)(*l*) (parent's rights to another child was terminated), MCL 712A.19b(3)(g) (failure to provide proper care and custody), and MCL 712A.19b(3)(j) (reasonable likelihood of harm). In Docket No. 326492, respondent-father appeals the order of the trial court terminating his parental rights to KJ, his daughter, under MCL 712A.19b(3)(g) (failure to provide proper care and custody) and MCL 712A.19b(3)(j) (reasonable likelihood of harm).[2] With regard to both appeals, we affirm.

---

[1] See *In Re Popiolek/Jones Minors, In Re K Jones Minor*, unpublished order of the Court of Appeals, issued April 10, 2015 (Docket Nos. 326422, 326492).

[2] Although JP's father was initially a part of the proceedings in docket number 326422, the trial court granted his motion for dismissal and separate adjudication on June 11, 2014. JP's father was later adjudicated and his parental rights were terminated in a separate proceeding. He is not a party to either appeal.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case began on March 18, 2014, when a bus driver observed respondent-father fall while carrying JP. The driver reported to Child Protective Services (CPS) that respondent-father appeared intoxicated. Sherry Carpenter, a CPS worker at the Department of Health and Human Services (DHHS), testified at the initial preliminary hearing that she visited respondent-father's home and that respondent-father was "stumbling, crying, somewhat incoherent." Respondent-father told Carpenter that he was getting respondent-mother ready to go to jail when the bus driver arrived with JP. Respondent-mother was going to jail for shoplifting and for possession of the drug Klonopin without a prescription.[3] Carpenter testified that respondent-father completed a drug screen in the home and tested positive for methadone and Suboxone.[4] Respondent-father claimed he had a prescription for Suboxone. Carpenter testified that respondent-mother told Carpenter that her mother was coming to care for the children while she was in jail. Carpenter stated that respondent-father told her that respondent-mother's mother had been convicted of manslaughter, and Carpenter independently confirmed this. At the conclusion of the first hearing, the trial court allowed respondent-father supervised visitation, but because respondent-mother was in jail, she would not have visitation until she was released.

At the next hearing, on April 15, 2014, respondent-mother entered a plea to the trial court's jurisdiction. Respondent-mother stated that she had entered a guilty plea for shoplifting and possession of Klonopin. She also stated that she had a history of substance abuse, including methamphetamine use as young as age sixteen. She also stated that respondent-father was under the influence and had insisted on getting JP from the bus when he slipped. The court found that it had jurisdiction. At the first dispositional hearing, held May 12, 2014, the trial court adopted a case-service plan and stated that the plan was to continue with reasonable efforts toward reunification.

A hearing was held on July 15, 2014 for purposes of entering respondent-father's plea.[5] Respondent-father admitted to the allegations in the petition that he had been using methadone and Suboxone. Respondent-father claimed to have a prescription for Suboxone but admitted that he did not have one for methadone. Respondent-father also admitted going to a parenting-time visitation after "having drank some alcohol." Respondent-father stated that he had been working

---

[3] Klonopin is a trade name of the drug clonazepam, a benzodiazepine and Schedule IV controlled substance. See MCL 333.7218.

[4] Suboxone is a prescription drug used to treat opioid addiction. See *Physicians Desk Reference* (2006).

[5] Subsequent to the trial court's initial assumption of jurisdiction, our Supreme Court issued its decision in *In re Sanders*, 495 Mich 394; 852 NW2d 524 (2014), which, among other things, abolished the "one parent doctrine" with regard to the adjudication phase of proceedings under the juvenile code, MCL 712A.1 et seq. The trial court held that, in light of this decision, the case-service plan was voluntary with respect to respondent-father prior to his entry of a plea to the court's jurisdiction.

at a place called Marinette Marine for a month and a half. The trial court accepted respondent-father's plea.

Foster-care worker JuliAnn Smith testified at this hearing that respondent-father had completed a second treatment program on June 15 after leaving his first. Smith also stated that respondent-father was not compliant with "Wraparound"[6] and had failed to give her his pay stubs. Smith also testified that respondent-father was homeless. Smith stated that respondent-mother had applied for a personal protection order (PPO) that day. The record does not explicitly say who the PPO was against, but the context of the statement supports the inference that it was against respondent-father because he would not leave respondent-mother alone and she did not want a relationship with him.

At a dispositional hearing on July 29, 2014,[7] Smith testified that respondent-mother was doing "really well," was currently living in a boarding house, and was employed at Hardees. Smith did testify that respondent-mother had one positive drug test for amphetamines, but also explained that she had prescriptions for Claritin and Prozac, and that Claritin can "do a false read." Smith also stated that respondent-mother had been doing very well with visits and that petitioner was recommending unsupervised visits. Conversely, Smith testified, respondent-father was "very resistant" to the case-service plan, was homeless, and did not want housing help. Smith also stated that respondent-father failed multiple drug screens and that Marinette Marine would not verify his employment.

Respondent-father was also ordered to provide child support to KJ beginning June 22, 2014. In August, petitioner filed motion for contempt against respondent-father and a show-cause hearing was held on August 22, 2014. Petitioner alleged that respondent-father had failed to make several $50 weekly support payments and had to attend a child support review hearing and bring proof of his income. Respondent-father pleaded guilty and admitted not making his required payment. When asked by the trial court for an explanation, respondent-father stated, "I've been moving around, I've been homeless and, um, so I've been losing a lot of paperwork and a lot of information that I need and then I didn't have a calendar and don't know, I was just very, uh whatever you say, unorganized." Respondent-father stated that he was no longer working. Respondent-father also admitted not passing drug tests and not going to Wraparound. The trial court ordered respondent-father to spend thirty days in jail, but stated that the sentence would be suspended if respondent-father paid $50 that day and then made $25 weekly payments until his arrearage of $250 was paid off. The trial court later ordered respondent-father to spend 30 days in jail due to continued failure to make his support payments.

The initial case against respondents was dismissed in October of 2014, and both children were returned to respondent-mother's care. However, petitioner filed a new petition and an emergency hearing was held on October 27, 2014. The petition requested the termination of

---

[6] Smith stated at a later hearing that Wraparound is a program that helps with housing, employment, and family needs.

[7] Respondent-father was not present at this hearing.

respondent-mother's and respondent-father's parental rights.[8]  The petition alleged that respondent-mother had contacted Jenny Messersmith, who had been the children's foster parent in the previous case, and asked her to care for the children.  When Messersmith arrived on October 25, 2014 to pick up the children, respondent-mother was unable to open the door (which was equipped with a child-proof handle) and did not know where JP was.  Messersmith contacted police and CPS.  The petition alleged that JP was eventually found in the custody of a convicted felon named Dustin Fournier.  Fournier was described in the petition as someone with "an assaultive history"; Carpenter testified that he had been convicted of felonious assault.

Carpenter testified that she went to respondent-mother's home on October 23, 2014 and that respondent-mother stated that her kids had been with Messersmith since 10:30 p.m. or 11:00 p.m. the night before.  Carpenter stated that respondent-mother denied being under the influence of drugs or alcohol.  Messersmith returned the children on October 24; CPS workers were present and conducted an oral drug screen on respondent-mother, which returned a positive for the prescription drug Xanax, for which respondent-mother did not have a prescription.  Carpenter testified that respondent-mother admitted having a "slip" and using Xanax.

Carpenter further testified that around 6:00 p.m. on October 25, 2014, respondent-mother called Messersmith to come pick up the children and when Messersmith arrived, respondent-mother was unable to open the front door and appeared intoxicated.  Messersmith stated that police arrived after respondent-mother was unable to open the door and that respondent-mother was visibly upset.  Carpenter testified that when law enforcement arrived, KJ was in the home but JP was not and respondent-mother initially did not know where he was.  Carpenter stated that it was later discovered that Fournier had JP.  Carpenter also testified that JP was not harmed at all during his time with Fournier.  The children were removed from the home and placed with Messersmith.  Carpenter opined that there was a substantial risk of harm to KJ and JP if they were returned to respondent-mother because of her state on October 25, 2014 when the police arrived.

At the preliminary hearing on October 31, 2014, it was revealed that respondent-mother had a prior termination of her parental rights in the state of Virginia in 2009 that was also related to substance abuse.  Carpenter testified at this hearing that respondent-father had been living with his grandparents and had not seen his daughter since September 2, 2014, when the previous case was ongoing.  Carpenter stated that during the last case, respondent-father had not completed his case-service plan.  The trial court authorized the petition and ordered that the goal remain reunification for both respondents.

Thereafter, the lawyer guardian ad litem (LGAL) for the children filed a motion to suspend the parenting time of both respondents.  A hearing was held on that motion on December 12, 2014.  Respondent-father was not present at the hearing but was represented by counsel.  Messersmith was sworn and testified that she had had JP and KJ since October 27, 2014. Messersmith testified that the past two weeks, respondent-mother has been consistent with her visits but that before that her visits were "sporadic."  Messersmith testified that she has to get

---

[8] JP's father was not a respondent to this new petition.

JP and KJ ready for visits and that there had been times she had gotten them ready and then had to tell them there would be no visit. Messersmith stated that when this happened, JP got upset; he also missed a full day of school. Messersmith testified that respondent-father misses parenting time "almost all the time."

Smith testified that respondent-mother missed six total parenting-time visits, one in December and five in November, and that respondent-father missed six visits in December and four visits in November. Smith also stated that she made an unannounced visit to where respondent-father was living on December 5, 2014, and that he told her he did not care about the case-service plan. Smith testified that respondent-father does not know how to interact with his daughter KJ, but that respondent-mother does engage both children and that they are bonded to her. The trial court ordered respondent-father's parenting time suspended but not respondent-mother's parenting time.

Neither party pleaded to the allegations in the October 27 petition. A joint jury and bench trial for adjudication was held on January 13 and 14, 2015. The respondent in the jury trial was respondent-father; respondent-mother did not wish to have a jury trial. Smith testified that the case-service plan established in the first case was meant to address the substance abuse issue and provide parent education and Wraparound services. Smith testified that respondent-mother did very well with her prior case-service plan, including finding a job and going to Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) meetings, and that she eventually was given unsupervised visitation with the children. Smith explained that this led to overnight visits and eventually the petition was dismissed. Messersmith testified that after the children were returned to respondent-mother, she still babysat and helped respondent-mother with groceries and rent.

A copy of the Virginia order terminating respondent-mother's parental rights to that child was admitted on the second day of respondent-mother's adjudication. The Virginia order states that respondent-mother's parental rights were terminated "upon a finding that the said infant child would be subject to an imminent threat to the extent that severe or irremediable harm would be likely to result if the child were returned to or left in the custody of her parents." The Virginia order stated that termination of respondent-mother's parental rights was in her daughter's best interests and that termination was pursuant to "Virginia Code § 16.1-278.3 and § 16.1-283," both of which require termination to be in the best interests of the child.

Respondent-mother testified that during the prior case she saw Smith, her counselor, and her peer coach weekly, and also that she attended Wraparound meetings at least once a week. Respondent-mother stated that she got a job at Hardees and worked there until October 20. Respondent-mother stated that she had concerns when the prior case ended on October 9, 2014 that it was ending too soon.

Regarding respondent-father, Smith testified that he was resistant to giving information to a substance abuse counselor. Smith stated that he did complete one in-patient drug treatment program, but also had numerous amounts of failed drug screens. Smith also testified that respondent-father's attendance at AA and NA meetings was sporadic and that he often did not show up for parenting times. Carpenter testified that respondent-father told her that he was employed but living with his grandparents and that he had not sought out help for his substance

abuse. Carpenter testified that respondent-father's grandparents were sent relative placement information but that they indicated that they could not be a placement on account of their age. Carpenter stated that her concerns regarding respondent-father related to unresolved issues from the prior case that had not been addressed.

Respondent-father admitted to using marijuana, Suboxone, and Dilantin. Respondent-father testified that he did complete one drug treatment program, but acknowledged that he later went back to using drugs. Respondent-father admitted that he cancelled or simply did not show up for parenting times, but he denied any knowledge about petitioner being able to offer him a ride. He acknowledged that he did not call or cancel the visits; he just did not show up. Respondent-father also admitted that services such as Wraparound were offered to him but that he did not follow through. Respondent-father testified that he had been working as a crane operator at Marinette Marines, but he failed a drug test and got fired after about a month and a half of working there. Respondent-father testified that he later got another job at a recycling facility, but that he quit. Respondent-father stated that people sometimes give him drugs for free but that he sometimes does buy drugs.

Respondent-father testified that he believed he could provide for KJ in a drug-free environment and that his grandfather had offered him work. Respondent-father acknowledged that presently he had no job or place for KJ to stay. When asked if he had complied with any of the requirements from his prior case-service plan, such as refraining from drug use, going to counseling, improving parenting skills, and staying away from drug users and criminals, defendant acknowledged that he had not complied with any of the requirements.

Smith described the incident on October 25, 2014 as a "major slip," but that it was not something that was utterly surprising. Carpenter testified that she believes respondent-mother's home environment is unfit because of her relapse, neglect, and substance abuse issues.

Escanaba Public Safety Department Officer Murray Pearce testified that he responded to respondent-mother's residence on October 25, 2014. Pearce testified that respondent-mother's eyes were bloodshot and glassy. Pearce stated there was a child protective cover on the door handle, but that an adult should be able to open the door with the protective cover on. Pearce opined that respondent-mother was under the influence of drugs or alcohol at the time.

Respondent-mother admitted that she was not able to open the door on October 25, 2014 and did not know where JP was that evening, but she denied using drugs that day. Respondent-mother admitted that she had lied to Carpenter about using drugs in October, and she admitted that she had tested positive for Xanax. Respondent-mother testified that she did not try to hide her relationship with Fournier and she thought that petitioner knew about it in September. Respondent-mother stated that she was not told until October of 2014 that it was not appropriate for Fournier to associate with the children. She stated that she was close to Fournier and would continue to include him in her children's lives although she knows that he has made mistakes in the past.

Respondent-mother testified that she enjoys visiting her children and that they are glad to see her. She also admitted that there were times that she did not show up for parenting-time visitation. She testified that she got fired from her job at Hardees and worked only one month at

a business called "El Patrons" before getting laid off. Respondent-mother testified that she had started attending college.

Both the trial court and the jury found grounds to assume jurisdiction over the children. The final dispositional hearing was held on February 12, 2015 and encompassed both statutory grounds for termination and a best-interest determination. Respondent-mother acknowledged at this hearing that her parental rights to her elder daughter had been terminated in Virginia.

Smith testified that respondent-mother had originally followed her case-service plan, but stated that with respondent-mother's history she did not know if respondent-mother "would be able to follow another case service plan." Smith stated that respondent-father did not accept help from the services that were provided to him and that he continued using drugs and had no employment. Smith offered her opinion that it would be desirable to keep the children together.

Taylor Stevens testified that she was a foster-care worker in this case who came on after Smith transferred on December 12, 2014. Stevens opined that termination would be in the best interests of the children because they are developmentally behind and need a stable environment. Stevens also testified that the children are bonded to each other, and it would be in their best interests to be kept together. Stevens stated that the children's bond with respondent-mother was deteriorating due to her absence at visits. Stevens testified that the permanency plan for KJ is adoption, and for JP the plan is to first see if her father had any available relatives for placement and then pursue adoption.

The trial court found that statutory grounds existed to terminate respondent-mother's parental rights under MCL 712A.19b(3)(*l*) because it found that respondent-mother had her parental rights terminated to another child in Virginia and that she chose not to work the Virginia case plan. The trial court also found that statutory grounds for termination existed to terminate respondent-mother's parental rights under MCL 712A.19b(3)(g) and (3)(j). The trial court found statutory grounds to terminate respondent-father's parental rights under MCL 712A.19b(3)(g) and (3)(j).

Regarding the children's best interests, the trial court again focused on the prior case in Virginia and respondent-mother's relationship with Fournier, which the court concluded she did not disclose to petitioner in September. The trial court also noted that respondent-mother had used drugs and had missed visitation. The trial court found that respondent-mother put her own needs ahead of her children's needs and that termination was in the children's best interests.

The trial court also found that termination of respondent-father's parental rights was in KJ's best interests. The trial court stated that respondent-father was selfish, that a father must support, protect, and make sacrifices for his child, and that respondent-father had not done any of those things.

These appeals followed.

## II. STANDARD OF REVIEW

We review a trial court's order terminating parental rights for clear error. MCR 3.977(K). A trial court's decision that termination is in the best interests of the children is

also reviewed for clear error. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). A decision of the trial court is clearly erroneous if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re JK*, 468 Mich 202, 209-210; 661 NW2d 216 (2003).

### III. DOCKET NO. 326422

### A. STATUTORY GROUNDS FOR TERMINATION

Petitioner bears the burden of proving by clear and convincing evidence the existence of at least one of the Legislature's enumerated specific conditions to terminate a parent's parental rights. *In re JK*, 468 Mich at 210. Here, the trial court terminated respondent-mother's parental rights pursuant to MCL 712A.19b(3)(g), (j), and (*l*). Those sections provide:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (g) The parent without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> * * *
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.
>
> * * *
>
> (*l*) The parent's rights to another child were terminated as a result of proceedings under [MCL 712A.2(b)] or a similar law of another state.

Respondent-mother does not dispute that her parental rights to another child were terminated in Virginia and acknowledges that the law of Virginia on the matter is similar to the law of Michigan. Because only one statutory ground is necessary to support terminating parental rights, *In re Powers Minors*, 244 Mich App 111, 118; 624 NW2d 472 (2000), we need not consider §§ 19b(3)(g) and (j).

Nonetheless, we conclude that the circuit court's findings regarding §§ 19b(3)(g) and (j) were not clearly erroneous. The record shows that respondent-mother had successfully completed her first case-service plan and that the children were returned to her care. However, she admitted to using Xanax less than a month after her children were returned to her. She also admitted that on October 25, 2014, she could not open the door to her home when Messersmith came to the home at her request. Respondent-mother admitted that she did not know if she would have been able to get the door open in the event of an emergency. Additionally,

respondent-mother was unaware of where JP was. Further, the record indicates that despite Fournier's criminal record, which included a conviction of felonious assault, respondent-mother planned to continue to involve him in the lives of her children. She also admitted that she missed multiple parenting-time visits during the pendency of the second case-service plan. Given the facts of her present situation, the court's conclusion that §§ 19b(3)(g) and (j) were satisfied was not clearly erroneous. *In re JK*, 468 Mich at 210.

## B. BEST-INTEREST DETERMINATION

Respondent-mother also argues that termination of her parental rights was not in the children's best interests. "If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). The trial court must find by a preponderance of the evidence that termination is in the best interests of the children. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). The children's bond to the parent, the parent's parenting ability, and the children's need for permanency, stability, and finality are all factors for the court to consider in deciding whether termination is in the best interests of the children. *In re Olive/Metts Minors*, 297 Mich App at 41-42.

Given respondent-mother's history, we do not find the trial court's decision to be clearly erroneous. There was testimony that respondent-mother interacted well with the children and that they were bonded to her. However, after the children were returned to her care and custody, she again used drugs. Additionally, the incident on October 25, 2014 was concerning because not only could respondent-mother not open the door, but she had no knowledge of where JP was. Again, as it turns out, JP was with a man who had a violent criminal history—a man she plans on keeping in her children's lives. There was also testimony that the children were developmentally behind and needed a stable environment.[9]

We therefore affirm the trial court's decision in docket number 326422.

## IV. DOCKET NO. 326492

### A. STATUTORY GROUNDS FOR TERMINATION

With regard to respondent-father's parental rights, the trial court found that statutory bases for termination existed under MCL 712A.19b(3)(g) and (3)(j). Respondent-father argues that petitioner did not give him sufficient time to rectify the conditions leading to the court's assumption of jurisdiction over KJ and that he was essentially "set up to fail." We disagree.

---

[9] We note that concerns expressed by respondent-mother at the final dispositional hearing regarding the status of JP's father's parental rights and the possibility of JP's placement with a paternal relative are no longer present on appeal, because the parental rights of JP's father have been terminated.

Termination under MCL 712A.19b(3)(g) is not proper when the "petitioner, itself, intentionally set[s] out to create the very ground for termination." *In re B & J*, 279 Mich App 12, 19; 756 NW2d 234 (2008). Such is not the case here. Respondent-father was offered many services, such as substance abuse treatment, which he either partially or completely refused. He was also offered housing and employment assistance, which he rejected. Respondent-father admitted that he missed a lot of recent parenting times simply because he did not show up. He admitted being homeless, being jobless, and using drugs. He did complete one drug treatment program, but pursuant to his own testimony, he began using drugs again after the treatment ended. By his own admission, respondent-father was the cause of his own failure to comply with the case-service plan, which was evidence of his inability to provide proper care and custody for KJ. *In re JK*, 468 Mich at 214; *In re Trejo*, 462 Mich 341, 360-363; 612 NW2d 407 (2000).

As for MCL 712A.19b(3)(j), respondent-father's problems were numerous and he did not seriously contest most of them. By his own admission he did not have a job, and he lost one of the jobs he had because of a positive drug test. He admits that he is still using drugs and acknowledged serving time in jail for failure to pay child support. At the time of trial he stated that he did not have an income or appropriate housing for KJ. There was no evidence on the record that respondent-father had addressed the issues that led to his homelessness and unemployment or that he would be able to provide a stable home for KJ in the future.

The trial court did not clearly err in determining that MCL 712A.19b(3)(g) and (j) were proven by clear and convincing evidence. *In re JK*, 468 Mich at 210.

## B. BEST-INTEREST DETERMINATION

The trial court also did not err in finding that termination of respondent-father's parental rights was in KJ's best interests. The trial court concluded that despite ample opportunity, respondent-father had failed to support, protect, and make sacrifices for his child. The trial court's findings are supported by the record. There was evidence that KJ was behind developmentally and need a stable environment. However, respondent-father admitted being homeless, being without a job, and continuing to use drugs. Therefore, by his own admissions, he could not provide the stable environment KJ needs at this stage in her life. *In re Olive/Metts Minors*, 297 Mich App at 41-42.

Affirmed in both docket numbers.

/s/ Mark T. Boonstra
/s/ William B. Murphy
/s/ Jane E. Markey

-10-